UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| KAREN D. VAUGHN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 1:16-cv-03257-JMS-DLP |
| | ) | |
| JOHN J. WERNERT, M.D., in his official | ) | |
| capacity as Secretary of the Indiana Family and | ) | |
| Social Services Administration, | ) | |
| YONDA SNYDER, in her official capacity as | ) | |
| Director of the Division of Aging of the Indiana | ) | |
| Family and Social Services Administration, | ) | |
| JOSEPH MOSER, in his official capacity as | ) | |
| Director of the Office of the Medicaid Planning | ) | |
| and Policy of the Indiana Family and Social | ) | |
| Services Administration, | ) | |
| | ) | |
| Defendants. | ) | |

## ORDER

This case is before the Court because Karen Vaughn, a woman living with quadriplegia, has been institutionalized in hospitals and nursing homes for nearly two years, and she wants to go home. She desires and is eligible to receive home-based care, and she seeks to require Defendants, various entities of the Indiana Family and Social Services Administration, to provide that care. She raises claims under the Americans with Disabilities Act, the Rehabilitation Act, and the Medicaid Act, arguing that Defendants have failed to provide her with the medical assistance for which she qualifies, thereby institutionalizing her against her will. Ms. Vaughn seeks injunctive relief, requiring Defendants to take whatever measures are necessary and required by law to provide her with community-based care in the setting of her home. Presently pending before the Court are the parties' cross-motions for summary judgment. [Filing No. 36; Filing No. 47.]

1

As described below, Defendants' positions depend on precisely the type of circular argument that was disapproved by the Seventh Circuit in *Steimel v. Wernert*, 823 F.3d 902 (7th Cir. 2016).  Applying that decision, and for the reasons that follow, the Court grants Ms. Vaughn's Motion as to the issue of liability, and denies Defendants' Motion.

## I.
### BACKGROUND

The Court finds that the following facts have been established through record evidence from the parties' submissions, as well as concessions and admissions made at a May 22, 2018 hearing on the parties' pending summary-judgment motions. The cross-motions initially indicated that there are no genuine disputes of material fact in this case, but further submissions eroded that position.  However, the facts underlying the Court's ruling are undisputed, and where disputes exist, they do not affect the decision. The facts below are undisputed, unless otherwise indicated.

Ms. Vaughn has lived with quadriplegia since 1976.  [Filing No. 36-2 at 27.] She requires assistance with most activities of daily living, including bathing, preparing and eating food, brushing her teeth, and passive range of motion exercises.  [Filing No. 36-2 at 11-12.]  Between 1981 and 2016, Ms. Vaughn lived in her own apartment, where she received services from home healthcare providers in order to assist in those activities of daily living.  [Filing No. 36-2 at 9.]  She received those services under a combination of programs funded by Indiana's Medicaid program. [Filing No. 36-2 at 9-11.]

As the Seventh Circuit has noted, "[n]o one would accuse the Medicaid program of simplicity."  *Steimel v. Wernert*, 823 F.3d 902, 906 (7th Cir. 2016).  There are a variety of ways in which individuals may qualify for home healthcare services under Indiana Medicaid, and the Court details several that are at issue in this case.  Under one avenue, Indiana Medicaid provides for home healthcare services on a "part-time and intermittent basis."  [Filing No. 36-3 at 142.]  The

number of hours approved for an individual to receive home healthcare is determined by several factors, including that individual's treatment plan and the complexity of the individual's needs. [Filing No. 36-3 at 142-43.]  Home healthcare can generally be authorized for up to 12 hours per day for individuals who require 24-hour monitoring.  [Filing No. 37 at 4.]  Up to 16 hours per day of skilled care on an ongoing basis may be approved in special situations via a "prior authorization" request.  [Filing No. 36-3 at 144.]  Home healthcare services under this "prior authorization program" do not include transportation or general household chores.  [Filing No. 36-3 at 152.]

Under another route, an individual may be approved for home healthcare on a more ongoing basis.  The "default assumption" under Medicaid is that certain types of healthcare and daily living services will be delivered in institutions.  *Steimel*, 823 F.3d at 906.  But in 1981, Congress enacted Section 1915(c) of the Social Security Act, 42 U.S.C. § 1396n, which established the Home and Community-Based Care Waiver Program ("HCB").  *Steimel*, 823 F.3d at 906-07 (citing Andrew I. Batavia, *A Right to Personal Assistance Services: "Most Integrated Setting Appropriate" Requirements and the Independent Living Model of Long-Term Care,* 27 Am. J.L. & Med. 17, 24 (2001)).  Recognizing that "many people are better served by and prefer community-based care," this waiver program allows "states to diverge from the traditional Medicaid structure by providing community-based services to people who would, under the traditional Medicaid structure, require institutionalization."  *Steimel*, 823 F.3d at 907.  Its purpose "was to provide real choices and opportunities to control their lives for individuals who wish to live in the community and allow deviation from Medicaid's traditional institutional bias."  *Steimel*, 823 F.3d at 907.

Pursuant to the HCB waiver program, Indiana's Medicaid agencies operate sub-program waivers "under which the state (and the federal government) will pick up the tab" for participating

individuals' care. *Steimel*, 823 F.3d at 907. The Indiana Family and Social Services Administration ("FSSA") runs the waiver program relevant to the instant case: the Aged and Disabled Medicaid Waiver Program (the "A&D Waiver").[1] *Steimel*, 823 F.3d at 906-07. Under the A&D Waiver, attendant care services are available to program participants. [Filing No. 36-4 at 1; Filing No. 36-4 at 48.] Those services "involve hands-on assistance" including bathing; oral hygiene; skin care; body mechanics; emptying urine and colostomy bags; meal planning, preparation, and clean up; waste disposal and household tasks; and assistance with correspondence and bill paying. [Filing No. 36-4 at 48-49.] Attendant care services can be provided through an agency or they can be consumer- or self-directed, where the recipient selects and hires her own attendant care provider. [Filing No. 37 at 5.]

Waiver participants may combine the A&D Waiver with "traditional" Medicaid services, including prior authorization services. *Steimel*, 823 F.3d at 907. As the parties confirmed at the May 22, 2018 hearing in this matter, prior to January 2016, Ms. Vaughn received services through a combination of Medicaid programs, including the A&D Waiver and prior authorization. Pursuant to prior authorization, she received home healthcare from two nurses per day who worked

---

[1] As the Seventh Circuit has noted, "[b]ecause Indiana has closed most of its institutional facilities, its waiver programs serve the vast majority of people with disabilities in Indiana." *Steimel*, 823 F.3d at 906.

in ten-hour shifts. [Filing No. 36-2 at 20.] And she received attendant care services via the A&D Waiver.[2]

In 2012, Ms. Vaughn received a tracheostomy[3] and began using a ventilator at night to assist her respiration. [Filing No. 36-2 at 10.] Secretions can build up inside the tracheostomy when an individual is unable to mobilize and remove them on her own (by coughing, for example). [Filing No. 55-2 at 31.] In those instances, suctioning is necessary in order to prevent the individual from choking. [Filing No. 36-2 at 17.] Ms. Vaughn's tracheostomy sometimes requires suctioning, at which point a tube is inserted into the opening, and a machine with suctioning power removes any accumulated secretions. [Filing No. 36-2 at 17.] While she lived in her apartment, Ms. Vaughn's home healthcare providers and friends would assist in suctioning her tracheostomy. [Filing No. 36-2 at 16-17.] Generally, while living in her apartment, Ms. Vaughn received regular and frequent visits from friends. [Filing No. 36-2 at 82.] Those visits including socializing in her apartment or balcony, enjoying a glass of wine, or going out to public locations. [Filing No. 36-2 at 81.]

---

[2] Another waiver program, the "Money Follows the Person" ("MFP") program, may well be implicated at the remedy phase of the case. According to FSSA's website, this program "is funded through a grant from the federal agency, Centers for Medicare and Medicaid Services. The MFP program was developed to help states move individuals from institutional settings to home and community-based settings. Indiana was approved for the MFP program in 2007 and since that time has focused on assisting eligible persons to leave institutional care by providing services for individuals to live safely in their community." FSSA website, https://www.in.gov/fssa/da/3475.htm, last accessed June 1, 2018. Thus far, Ms. Vaughn has not received services under this program.

[3] A tracheostomy is the creation of an opening through the neck to the anterior trachea for insertion of a tube to relieve upper airway obstruction and facilitate ventilation. *Dorland's Medical Dictionary* (online version), www.dorlands.com, last accessed May 25, 2018. [*See also* Filing No. 55-2 at 29.]

In January 2016, Ms. Vaughn was hospitalized at Methodist Hospital with pneumonia. [Filing No. 36-2 at 19.] Within one to two weeks, Ms. Vaughn's treating physician indicated that her treatments had been successful, and that Ms. Vaughn was ready to return home, provided she had the proper support in place. [Filing No. 36-2 at 20.]

Karen Stricker is a licensed clinical social worker, [Filing No. 62-1 at 9], and she is currently a psychosocial worker within the pulmonary unit at Methodist, [Filing No. 62-1 at 12]. As part of her duties, she assists patients in addressing barriers to discharge from the hospital, including family, housing, and financial issues. [Filing No. 62-1 at 12-13.] During Ms. Vaughn's hospitalization, Ms. Stricker worked with a nurse case manager in order to facilitate Ms. Vaughn's discharge from the hospital. [Filing No. 62-1 at 25-26.] Together, they attempted to locate an agency, or multiple agencies in combination that would be willing to provide Ms. Vaughn's home healthcare services, as she had received prior to her hospitalization. [Filing No. 62-1 at 25-26.] Ms. Stricker and the case manager contacted between 30 and 40 agencies, and they could find none that would agree to provide Ms. Vaughn's care, either alone or in combination. [Filing No. 62-1 at 27.]

Staff of the FSSA Division of Aging also assisted Methodist staff in attempting to locate home healthcare providers for Ms. Vaughn. [Filing No. 36-1 at 2.] FSSA employees Yonda Snyder, Debbie Pearson, and Tanya Downing were all involved in various efforts to develop and implement a home healthcare plan for Ms. Vaughn. [Filing No. 36-1 at 2.] Those efforts included phone calls to potential home healthcare agencies and meetings with Ms. Vaughn, Methodist staff and physicians, and staff of CICOA (a local Agency on Aging). [Filing No. 36-1 at 2-3.] None of these efforts resulted in identifying an agency or agencies that agreed to provide care for Ms. Vaughn. [Filing No. 55-2 at 43; Filing No. 36-1.] Leslie Deitchman, the President Administrator

at Tendercare Home Health Services, Inc. ("Tendercare"), attested that the reimbursement rates paid by Indiana's Medicaid plan are inadequate to pay the nurses and aides that Ms. Vaughn would need. [Filing No. 47-4 at 1.] According to Ms. Deitchman, Tendercare "would like to provide care to Karen again, but [it] cannot do so at a loss." [Filing No. 47-4 at 1.]

As discussed at the May 22 hearing, these efforts to locate a home healthcare provider were expressly limited by two factors: the reimbursement rate offered by Defendants to home healthcare providers, and the "Medicaid Policy Manual" requirements that certain tasks be performed by skilled medical professionals. But, as Defendants discovered in attempting to locate care providers for Ms. Vaughn, no skilled medical provider will provide the care at the reimbursement rates authorized by the State. Significantly, however, both Ms. Vaughn and her health care providers disagree with the Manual's requirement that a skilled level of care is necessary for some of the tasks associated with Ms. Vaughn's care. Ms. Vaughn has requested relief from the Manual's skilled care requirements. Defendants have offered no source of authority aside from the Medicaid Policy Manual itself as to why it cannot accommodate Ms. Vaughn's request for some skill-level service modifications.

On April 12, 2016, Ms. Vaughn sent a letter to the FSSA stating that because the FSSA had been unable to secure a home healthcare provider, she was being held at Methodist against her will. [Filing No. 47-1 at 6.] Citing the Americans with Disabilities Act, she requested the following "reasonable accommodations":

- That her Medicaid Plan of Care remain in effect and include a baseline of 22 hours per day of Prior Authorization services, plus 2 hours per day of A&D Waiver services for homemaker and personal attendant services;

- That she be permitted to directly hire and train qualified staff for the level of service she believes most appropriate to her needs, at competitive rates, to cover the hours of service approved in her Medicaid Plan of Care;

- That the state of Indiana provide or contract for payroll and related services to cover the staff she directly hires;

- That the requirement to hire either nursing staff or staff employed by a Medicaid provider agency be waived; and

- That her Plan of Care be amended to include the cost of hiring a qualified, professional Long Term Care Manager of Ms. Vaughn's choosing at a competitive private rate.

[Filing No. 47-1 at 6.] On July 18, 2016, Ms. Stricker and Dr. Chad Trambaugh, one of Ms. Vaughn's treating physicians at Methodist, sent FSSA a letter in support of Ms. Vaughn's request for reasonable accommodation. [Filing No. 55-2 at 43.] That letter states, *inter alia*, that:

- Nursing agencies do not have enough nurses to staff Ms. Vaughn, even with special attempts to recruit more nurses;

- "Any lay person could be taught how to safely provide Ms. Vaughn's care"; and

- Ms. Vaughn "absolutely does not need to be placed in a skilled nursing facility."

[Filing No. 55-2 at 43.] Dr. Trambaugh and Ms. Stricker supported Ms. Vaughn's request that she be permitted to hire and train her own staff to provide 22 hours of daily Medicaid prior authorization services, plus Medicaid waiver services. [Filing No. 55-2 at 43.] Ms. Vaughn attests that she received no formal response to her letter. [Filing No. 36-2 at 45.]

Dr. Robert W. Weller is an internist and pulmonologist at Methodist Hospital, an Assistant Professor of Clinical Medicine at Indiana University School of Medicine, and has cared for Ms. Vaughn since 2011. [Filing No. 47-2 at 1.] According to Dr. Weller, long-term placement in either a skilled nursing facility or a hospital is not the best medical option for Ms. Vaughn. [Filing No. 47-2 at 2.] In a nursing facility, Ms. Vaughn is at continuous risk of nosocomial infections,[4] and such infections compromise her respiratory function and pose a risk to her life. [Filing No.

---

[4] A "nosocomial infection" is "an infection not present or incubating prior to admittance to a hospital, but occurring a few days after admittance." *Dorland's Medical Dictionary* (online version), www.dorlands.com, last accessed May 25, 2018.

47-2 at 2.] Dr. Trambaugh agrees with all of Dr. Weller's assessments. [Filing No. 61-2 at 44.] Increased risk of developing bedsores is also a potential hazard of institutionalized care. Prior to being hospitalized in 2016, Ms. Vaughn had not developed a decubitus ulcer (or bedsore) in over twenty years. [Filing No. 36-2 at 82-83.] She attributes part of her success in avoiding such ulcers to the fact that at home, she uses a water bed, which avoids putting pressure on specific areas of her body. [Filing No. 36-2 at 14.] While institutionalized, she must be turned every two hours in order to prevent bedsores, and she does not always receive that care. [Filing No. 36-2 at 14; Filing No. 36-2 at 83.]

On July 26, 2016, Division of Aging staff met with Ms. Vaughn, hospital staff and doctors, Ms. Vaughn's advocates, and her legal counsel to discuss a care plan that included finding a home healthcare provider for Ms. Vaughn. [Filing No. 36-1 at 2.] Division of Aging staff continued to attempt to locate home healthcare agencies that would, in combination, be willing and able to meet Ms. Vaughn's needs. [Filing No. 36-1 at 2-3.] Within the bounds of the current Medicaid programs, as administered by FSSA, no healthcare providers were found. [Filing No. 36-2 at 60.] In mid-November 2016, Ms. Vaughn was discharged to North Capitol nursing home. [Filing No. 36-2 at 60.]

Ms. Vaughn resided at North Capitol through February 2017, when she was hospitalized at Methodist after developing a decubitus ulcer that required surgery. [Filing No. 36-2 at 23-24.] After that surgery, Ms. Vaughn was again medically cleared for discharge home. [Filing No. 36-2 at 25.] Ms. Vaughn's desire to return home remained unchanged, and according to Ms. Snyder, Division of Aging staff called fifty providers in an attempt to locate one or several that could provide Ms. Vaughn's home healthcare within the existing Medicaid regime. [Filing No. 36-1 at 3.] Again, none were found. [Filing No. 36-1 at 3-4.] In December 2017, Ms. Vaughn was

discharged to Ambassador Healthcare nursing home in Centerville, Indiana, where she still resides today. [Filing No. 36-2 at 23; Filing No. 47-1 at 1.] Centerville is over 60 miles away from Ms. Vaughn's home and friends in Indianapolis. At all times relevant to this lawsuit, Ms. Vaughn has wished, and continues to wish, to reside at home. [Filing No. 47-1 at 1.]

Ms. Vaughn filed a Complaint in this Court on November 30, 2016, seeking declaratory and injunctive relief. [Filing No. 1.] Ms. Vaughn's Complaint raises three claims, for violations of the Americans with Disabilities Act, the Rehabilitation Act, and the Medicaid Act. [Filing No. 1.] Presently pending before the Court are the parties' cross-motions for summary judgment, which are now fully briefed. [Filing No. 36; Filing No. 47.] As noted, the Court held a hearing regarding those pending motions on May 22, 2018. [Filing No. 63; Filing No. 64; Filing No. 65.] Those motions are now ripe for the Court's review.

## II.
### LEGAL STANDARD

A motion for summary judgment asks the Court to find that a trial is unnecessary because there is no genuine dispute as to any material fact and, instead, the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). As the current version of Rule 56 makes clear, whether a party asserts that a fact is undisputed or genuinely disputed, the party must support the asserted fact by citing to particular parts of the record, including depositions, documents, or affidavits. Fed. R. Civ. P. 56(c)(1)(A). A party can also support a fact by showing that the materials cited do not establish the absence or presence of a genuine dispute or that the adverse party cannot produce admissible evidence to support the fact. Fed. R. Civ. P. 56(c)(1)(B). Affidavits or declarations must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on matters stated. Fed. R. Civ. P. 56(c)(4). Failure to properly support a fact in opposition to a movant's factual assertion

can result in the movant's fact being considered undisputed, and potentially in the grant of summary judgment. Fed. R. Civ. P. 56(e).

In deciding a motion for summary judgment, the Court need only consider disputed facts that are material to the decision. A disputed fact is material if it might affect the outcome of the suit under the governing law. *Williams v. Brooks*, 809 F.3d 936, 941-42 (7th Cir. 2016). In other words, while there may be facts that are in dispute, summary judgment is appropriate if those facts are not outcome-determinative. *Montgomery v. American Airlines Inc*., 626 F.3d 382, 389 (7th Cir. 2010). Fact disputes that are irrelevant to the legal question will not be considered. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

On summary judgment, a party must show the Court what evidence it has that would convince a trier of fact to accept its version of the events. *Gekas v. Vasilades*, 814 F.3d 890, 896 (7th Cir. 2016). The moving party is entitled to summary judgment if no reasonable fact-finder could return a verdict for the non-moving party. *Nelson v. Miller*, 570 F.3d 868, 875 (7th Cir. 2009). The Court views the record in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor. *Skiba v. Illinois Cent. R.R. Co.*, 884 F.3d 708, 717 (7th Cir. 2018). It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the fact-finder. *Miller v. Gonzalez*, 761 F.3d 822, 827 (7th Cir. 2014). The Court need only consider the cited materials, Fed. R. Civ. P. 56(c)(3), and the Seventh Circuit Court of Appeals has repeatedly assured the district courts that they are not required to "scour every inch of the record" for evidence that is potentially relevant to the summary judgment motion before them. *Grant v. Trustees of Indiana University,* 870 F.3d 562, 573-74 (7th Cir. 2017). Any doubt as to the existence of a genuine issue for trial is resolved against the moving party. *Ponsetti v. GE Pension Plan*, 614 F.3d 684, 691 (7th Cir. 2010).

The existence of cross-motions for summary judgment does not imply that there are no genuine issues of material fact. *R.J. Corman Derailment Servs., LLC v. Int'l Union of Operating Engineers, Local Union 150, AFL-CIO*, 335 F.3d 643, 647 (7th Cir. 2003).

## III.
### DISCUSSION

### A. ADA and Rehabilitation Act Claims

In her Complaint, Ms. Vaughn alleges that Defendants have violated the ADA and Rehabilitation Act (and their related regulations) by "excluding [her] from participating in FSSA's services, programs or entities, and [by] failing to provide [her] with services in the most integrated setting appropriate to her needs." [Filing No. 1 at 11.] Ms. Vaughn alleges that she and her doctors agree that it is medically and socially preferable for her to receive services at home—the most integrated setting appropriate to her needs. [Filing No. 1 at 7.]

Defendants move for summary judgment on Ms. Vaughn's ADA and Rehabilitation Act claims, arguing that they have not denied Ms. Vaughn any services. [Filing No. 37 at 11.] Defendants contend that they have gone to great lengths to locate home healthcare providers, but they have been unable to find any entity that will agree to provide Ms. Vaughn's care. [Filing No. 37 at 12.] They argue that this is all that is required of them, and that they cannot "force providers to accept [Ms.] Vaughn as a patient." [Filing No. 37 at 12.] Defendants also argue that Ms. Vaughn's request that she be permitted to use the self-directed care program to hire and train her own staff constitutes a fundamental alteration of the self-directed care program, which they are not required to provide. [Filing No. 37 at 12.]

Ms. Vaughn cross-moves for summary judgment, arguing that Defendants have failed to make the reasonable accommodations that she seeks in order to receive home healthcare services. [Filing No. 48 at 20.] Ms. Vaughn contends that Defendants bear the burden of establishing that

any requested accommodation would constitute a fundamental alteration of an existing program, and that they have failed to offer any evidence of fundamental alteration—falling far short of meeting their burden. [Filing No. 48 at 22.]

### 1. Legal Standard

"Congress intended the ADA to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities." *Steimel*, 823 F.3d at 909 (citing *Olmstead v. L.C. ex rel. Zimring,* 527 U.S. 581, 589 (1999)). The ADA decrees that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. A "public entity" includes "any State or local government" or "any department [or] agency ... of a State ... or local government." *Id.* §§ 12131(1)(A), (B). A "qualified individual with a disability" is someone who "with or without reasonable modifications to rules, policies, or practices ... meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity."[5] *Id.* § 12131(2).

"The ADA directs the Attorney General to promulgate regulations that implement the provisions of Title II, including § 12132." *Steimel*, 823 F.3d at 909 (citing 42 U.S.C. § 12134(a)). In response, the Attorney General implemented the regulation known as the "integration mandate." *Steimel*, 823 F.3d at 909. As the Seventh Circuit has described:

---

[5] In their reply brief, Defendants appear to argue that Ms. Vaughn is not a qualified individual with a disability, covered by the ADA and Rehabilitation Act. [Filing No. 55 at 9.] At the hearing in this matter, Defendants clarified that they concede the application of the ADA and Rehabilitation Act generally to Ms. Vaughn—instead they argue with the particular programs or services for which Ms. Vaughn qualifies. They contend that the inability to locate a provider willing to provide services within the current program regime renders Ms. Vaughn unqualified.

> [t]he integration mandate states that a public entity shall administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities. The regulations' preamble defines "the most integrated setting appropriate to the needs of qualified individuals with disabilities" as "a setting that enables individuals with disabilities to interact with non-disabled persons to the fullest extent possible."

*Steimel*, 823 F.3d 909 (quoting 28 C.F.R. § 35.130(d); 28 C.F.R. pt. 35, App. B). Public entities are required to make "reasonable modifications" to their "policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability" unless doing so would "fundamentally alter" the nature of the programs. *Steimel*, 823 F.3d at 909 (citing 28 C.F.R. § 35.130(b)(7)).

"Congress explicitly identified unjustified segregation of persons with disabilities as a form of discrimination." *Olmstead*, 527 U.S. at 600 (citing 42 U.S.C. § 12101(a)(2) ("historically, society has tended to isolate and segregate individuals with disabilities, and, despite some improvements, such forms of discrimination against individuals with disabilities continue to be a serious and pervasive social problem"); § 12101(a)(5) ("individuals with disabilities continually encounter various forms of discrimination, including ... segregation")); *see also Steimel*, 823 F.3d at 910. Discrimination includes "not only disparate treatment of comparably situated persons but also undue institutionalization of disabled persons, *no matter how anyone else is treated.*" *Steimel*, 823 F.3d at 910 (emphasis in original) (citing 42 U.S.C. § 12132; *Olmstead*, 527 U.S. at 597-603). The Seventh Circuit has recognized that the state might violate the integration mandate "if it operates programs that segregate individuals with disabilities or through its planning, service system design, funding choices, or service implementation practices, promotes or relies upon the segregation of individuals with disabilities in private facilities or programs." *Steimel*, 823 F.3d at 911.

The relevant provisions of the Rehabilitation Act and its regulations "are materially identical to their ADA counterparts," and "courts construe and apply them in a consistent manner." *Steimel*, 823 F.3d 909 (internal citations omitted).

The parties agree, as does the Court, that the integration mandate is implicated by Ms. Vaughn's claims. *Olmstead* set out a test for determining whether the integration mandate has been violated. While that case involved mental disabilities, the *Steimel* court applied the *Olmstead* test to a case involving individuals with both physical and mental disabilities. *See Steimel*, 823 F.3d at 914. This Court therefore sees no reason why the *Olmstead* test should not apply in the context of a person who has only physical disabilities. As so adapted, states are required to provide community-based treatment for persons with physical disabilities when (1) the State's treatment professionals determine that such treatment is appropriate; (2) the affected persons do not oppose such treatment; and (3) the placement can be reasonably accommodated, taking into account the resources available to the State and the needs of others with physical disabilities. *See Id*.

The *Steimel* court noted that the first two elements of this test appear in a section of the *Olmstead* decision that commanded a majority of the Court, while the third element commanded only a plurality. *Steimel*, 823 F.3d at 914-15. *Steimel* concluded that the third element, if considered "bear[ing] in mind the cautionary remarks of the concurring justices," should serve as a starting point for determining what "reasonable modifications" are required. *Id.* "By specifying that both the 'resources available to the State' and 'the needs of others with mental disabilities' must be taken into account, the plurality's test allows for a sensitive balance between the interests of the state and the interests of the developmentally disabled persons." *Id.* at 915. Ultimately, the court concluded, the "question under the ADA is a simple one: what effect will changing the state's

practices have on the provision of care to the…disabled, taking into account the resources available to the state and the need to avoid discrimination?" *Id*.

The parties do not dispute the second element of the *Olmstead* test, agreeing that Ms. Vaughn does not oppose community-based treatment. Therefore, only the first and third elements are at issue.

### 2. Olmstead Test: Whether the requested treatment is appropriate

The Court begins with the first element: whether treatment professionals have determined that the treatment requested by the individual (in this case, to receive services in a home-based setting) is appropriate.

Ms. Vaughn has presented evidence, and Defendants do not dispute, that Ms. Vaughn received home healthcare services prior to her hospitalization for pneumonia. [Filing No. 36-2 at 9-11.] In their brief in support of their Motion for Summary Judgment, Defendants appear to concede that home healthcare services are appropriate for Ms. Vaughn, as they highlight that they "have been actively working since 2016 to secure a provider so that Vaughn can receive health care nursing services at home." [Filing No. 37 at 11.] In their reply brief, however, Defendants state that they do not concede this element, and they argue that, for two reasons, Ms. Vaughn cannot establish that placement in a home-based setting is appropriate: (1) Ms. Vaughn now suffers from a condition called autonomic hyperreflexia; and (2) Ms. Vaughn does not currently have a Medicaid plan of care or a certification of the medical necessity of home healthcare services from a physician. [Filing No. 55 at 12.]

Regarding Ms. Vaughn's autonomic hyperreflexia diagnosis, Defendants have presented no evidence that this condition renders Ms. Vaughn ineligible or inappropriate for home healthcare services. While the condition might impact which particular services she receives—although the

16

evidence does not establish that either—Defendants have not provided any evidence supporting a contention that individuals with this condition are ineligible to receive care at home. Ms. Vaughn, on the other hand, has provided undisputed evidence that her treating physicians have concluded that home-based services are both appropriate and preferable for her, even with the autonomic hyperreflexia diagnosis. Dr. Trambaugh testified that a patient suffering from an episode of autonomic hyperreflexia (involving a rise or drop in blood pressure) while at home would typically receive no treatment or intervention. [Filing No. 61-2 at 31 ("[A]t home, typically you wouldn't do anything.").] Even after Ms. Vaughn's diagnosis, Dr. Trambaugh testified that a home-based placement remained the preferable option. [Filing No. 61-2 at 42 ("Q: Do you still believe that Karen Vaughn can reside at home with appropriate care? A: I do.").]

Defendants' second argument—that Ms. Vaughn does not currently have a Medicaid plan of care or a physician certification—demonstrates a circularity that, as noted at the hearing, permeates this case. While Ms. Vaughn does indeed lack a plan of care and physician certification, she alleges that they are absent *because of* the very state-imposed obstacles that she challenges. For example, Dr. Trambaugh testified that, although he believed that Ms. Vaughn was ready and able to be discharged home, he was never able to sign off on Ms. Vaughn's home healthcare certification because no provider had been located. [Filing No. 61-2 at 38.] Dr. Trambaugh testified that at the time that Ms. Vaughn became ready for discharge, he was prepared to and would have signed off on any certification required. [Filing No. 61-2 at 38.] On July 18, 2016, Dr. Trambaugh and Ms. Stricker sent a letter in support of Ms. Vaughn's reasonable accommodation request, asking Defendants to consider an alternative staffing arrangement in order to allow Ms. Vaughn to return home. [Filing No. 36-2 at 115.] And as efforts continued to

locate home healthcare providers, including in April 2018 when Dr. Trambaugh's deposition was taken, he continued to support her discharge home. [Filing No. 61-2 at 42.]

Regarding the plan of care, the same circularity exists. Ms. Vaughn's argument here is that Defendants' own policies regarding what tasks must be performed by skilled medical professionals, as opposed to lay persons or other home health aides, have resulted in her remaining institutionalized. Defendants' requirement of a plan of care relying primarily on skilled nurses, hired through home healthcare agencies, consistently resulted in Defendants identifying no providers who would agree to provide Ms. Vaughn's care. At the hearing and in their briefing, the parties have indicated that a Medicaid plan of care is developed as a collaborative effort between Ms. Vaughn, her healthcare providers, and Defendants. Several of Ms. Vaughn's requested modifications (including those supported by her physicians and other Methodist staff) involve receiving authorization from Defendants to have some of her healthcare services performed by non-skilled personnel. But Defendants have indicated that they have not approved and do not approve that modification request. Given Defendants' opposition to elements of the plan of care suggested by Ms. Vaughn and her healthcare providers, it is unclear how Ms. Vaughn could be expected to provide here a plan of care that includes the very disputed elements that her Complaint seeks to require Defendants to provide.

The undisputed medical evidence establishes that at or near the time of the filing of this Complaint, Ms. Vaughn's physicians believed that she could and should be cared for at home—both because home healthcare is medically safer and socially preferable for her, and because Ms. Vaughn desires to be at home. [Filing No. 47-2; Filing No. 61-2 at 44.] That support has continued throughout the pendency of this litigation, through at least April of 2018 when Dr. Trambaugh was deposed. Based on the evidence before this Court, it concludes as a matter of law that Ms. Vaughn

has established that treatment professionals have determined that the treatment she requests—home healthcare—is appropriate.

### 3. Olmstead Test: Whether placement can be reasonably accommodated

#### i. Reasonableness

The Court next turns to the third element of the *Olmstead* test—whether the placement can be reasonably accommodated, taking into account the resources available to the State and the needs of others with physical disabilities. *See Steimel*, 823 F.3d at 914. As described above, if the placement can be reasonably accommodated, Defendants are required to do so unless the accommodation would constitute a fundamental alteration of an existing program.

Defendants do not contend that resource constraints render unreasonable any accommodation that Ms. Vaughn seeks. At the hearing on the parties' cross-motions for summary judgment, Defendants confirmed that Ms. Vaughn has in the past been approved for services in the amount of approximately $395,000 per year, and that they have no reason to believe that similar amounts would be disapproved now. And they have presented no evidence or argument that provision of the requested services by other than skilled medical providers would negatively impact the provision of care to other individuals with physical disabilities.

Instead, Defendants appear to argue that Ms. Vaughn's accommodation request is not reasonable because Indiana Medicaid is entitled to deference as to its determination that Ms. Vaughn's home healthcare services may only be provided by skilled healthcare professionals, hired by the state via home healthcare agencies. [Filing No. 37 at 13.] The Court notes at the outset that throughout their briefing, Defendants largely seek to narrowly characterize Ms. Vaughn's request as merely seeking to expand the "self-directed attendant care program to hire lay people to meet her needs." [Filing No. 37 at 13.] However, Ms. Vaughn's Complaint seeks

relief in language significantly broader than that. She alleges that "Defendants have failed to modify FSSA policies, practices, and procedures to provide [Ms.] Vaughn with community-based services." [Filing No. 1 at 12.] She seeks whatever reasonable accommodation is necessary in order to provide her with care in a community-based setting.

The Court here focuses on the two primary modifications that appear to be at issue—Ms. Vaughn's requests to either self-direct her care, or that Defendants broaden their definition of services that can be provided by non-skilled caregivers, as opposed to skilled nurses. But that is not to suggest that Defendants are somehow precluded from exploring or implementing other accommodations that would achieve the desired end result: providing Ms. Vaughn with care in a home-based setting. *See Steimel*, 823 F.3d at 916 (discussing the plaintiffs' position that reinstatement to a particular waiver program would be "one of the outcomes" that the plaintiffs would accept, but "it is not the only one").

The issues raised by the present case are remarkably similar to those raised in *Steimel*, and the Seventh Circuit's analysis in that case provides the framework for the Court's discussion here. Indeed, the Court is perplexed by Defendants' easy dismissal of *Steimel*'s application here, given the recent vintage of that decision, and that the state was a party in both cases. Defendants seek to distinguish *Steimel* because there the State withdrew benefits that it once provided. Here, Defendants stopped providing the home-based care that they once provided. The difference—to the extent any exists—is meaningless.

As in *Steimel*, Defendants' only argument as to the reasonableness of Ms. Vaughn's requested accommodations depends on circular logic. In essence, Defendants argue that the modifications requested by Ms. Vaughn are not reasonable because her requests would require

Defendants to alter their own policies or programs. This is precisely the argument considered and rejected in *Steimel*. *See* 823 F.3d at 916.

As discussed at the hearing, Defendants' policy regarding home healthcare services designates certain services as requiring skilled care. Ms. Vaughn requests that Defendants modify that policy to approve the use of a wider variety of medical professionals or trained lay persons to provide some of those "nurse-only" services as part of her home healthcare plan. At the hearing, Defendants identified the "Medicaid Policy Manual" as the sole identifiable source of the requirements regarding what services must be performed by skilled nurses. The section of the Manual identified by Defendants in their briefing relates to Respiratory Disorders and includes the following chart:

| Services Requiring Skilled Care | Services Requiring Non-Skilled Care |
|---|---|
| • Oral medication administration<br>• IV medication administration<br>• Parenteral/enteral nutrition<br>• Vital signs<br>• Ventilator operation/maintenance<br>• Tracheostomy maintenance/change<br>• Suctioning<br>• Complex treatment modalities (sterile dressing, wound care)<br>• Respiratory treatments | • Assist with bathing, dressing, ADLs (total care may be required)<br>• Skin care<br>• Oral care<br>• Force fluids as instructed<br>• Assist with ambulation<br>• Exercise active/passive<br>• Assist with meals (oral feeding)<br>• Vital signs |

[Filing No. 36-3 at 150-51.] The section regarding respiratory care services ends following the chart, and there is no further explanation regarding the provision of care.

Ms. Vaughn argues that if Defendants modified their policies (either under the prior authorization program or the self-directed care waiver program) to allow a different combination of services, or to allow non-skilled individuals to provide some of the services listed on the "skilled care" side of the chart, a wider universe of healthcare providers could be sought or engaged to

provide her care.  [*See* Filing No. 48 at 22.]  Defendants simply argue that they are entitled to develop and enforce this policy, to choose whom they wish to pay for specific services, and that their determinations are entitled to deference.  *Steimel*, however, does not support this contention.

There, the court highlighted that all reasonable accommodation requests seek a policy change on the part of the state, and if any request to modify a policy were deemed inherently unreasonable, the integration mandate would have no meaning.  As the court explained:

> …the state's logic is circular.  After all, the state creates the waiver programs, and therefore those programs' eligibility criteria.  If the state's own criteria could prevent the enforcement of the integration mandate, the mandate would be meaningless.  The regulation adjacent to the "reasonable modifications" provision anticipates—and directly confronts—this problem.  *See* 28 C.F.R. § 35.130(b)(8) ("A public entity shall not impose or apply eligibility criteria that screen out or tend to screen out an individual with a disability or any class of individuals with disabilities from fully and equally enjoying any service, program, or activity, unless such criteria can be shown to be necessary for the provision of the service, program, or activity being offered.").  The state has made no showing that its criteria are "necessary for the provision" of the relevant services in this case.  It cannot avoid the integration mandate by binding its hands in its own red tape.

*Steimel*, 823 F.3d at 916.  This Court sees nothing unreasonable in Ms. Vaughn's request that Defendants consider a change to their skilled-care classifications, especially given that the classification is established by a policy manual and not a statute or regulation.

But even if the Court were to accept Defendants' contention that the Court must afford some deference to their determinations as to the necessity of skilled versus non-skilled care, Defendants have offered no explanation as to the basis for those determinations.  The only source of authority identified by Defendants as to why skilled care is required for certain services—the Medicaid Policy Manual—provides no indication as to how various services are characterized.  A review of the Manual itself provides no further insight, and indeed supports Ms. Vaughn's contention that Defendants could re-characterize some of the tasks as appropriate in an individual

case. Many of the same tasks are listed as both skilled and non-skilled care, depending on the body system disorder and/or an individual's plan of care.

For example, Ms. Vaughn demonstrates one of the symptoms of "Central Nervous System (CNS) Disorders"—namely, paralysis. [Filing No. 36-3 at 146.] The corresponding chart regarding skilled and non-skilled care in that section is as follows:

| Services Requiring Skilled Care | Services Requiring Non-skilled Care |
|---|---|
| <ul><li>Vital signs</li><li>Ventilator operation/maintenance</li><li>Central line maintenance/dressings</li><li>Complex treatment modalities (sterile dressings, soaks, packing, etc.)</li><li>Parenteral/enteral nutrition</li><li>Oxygen therapy</li><li>Respiratory treatments</li><li>Tracheostomy maintenance/change</li><li>Suctioning (frequency/secretion type)</li><li>Stimulation (verbal/tactile)</li><li>Tube feedings/maintenance of tube</li><li>IV medication administration</li><li>Urinary catheter maintenance/change</li><li>Exercise (active/passive)</li></ul> | <ul><li>Bathing/linen change/dressing</li><li>Catheter care</li><li>Skin care</li><li>Minor treatment modalities</li><li>Oral care</li><li>Stimulation</li><li>Continue plan of OT/PT</li><li>Assist with transfers/ambulation</li><li>Positioning</li><li>I&O records</li><li>Assist with oral feedings</li><li>Splint or brace application</li><li>Exercise (active/passive)</li><li>Ensure safety measures (seizure precautions)</li><li>Vital signs</li></ul> |

**Note:** On the above table and subsequent Skilled vs. Non-skilled Care tables, those services appearing on both sections may be either, as justified by the required Plan of Treatment during PA review.

[Filing No. 36-3 at 147.] As the note indicates, some of these services can be performed by *either* skilled or non-skilled caregivers, as deemed appropriate in an individual's plan of care. Some of these overlapping services include active and passive exercise (which is, interestingly, only listed as skilled care on the corresponding respiratory disorders chart), stimulation, and vital signs. [Filing No. 36-3 at 147.] In yet another chart, regarding "Gastrointestinal Disorders," vital signs

are listed as only skilled care services, and exercise is listed as only a non-skilled care service. [Filing No. 36-3 at 148-49.] In the "Central Nervous System Disorders" chart, "positioning" is listed as only a non-skilled care service, [Filing No. 36-3 at 147], but on the "Musculoskeletal Disorders" chart, "position changes" are listed as only a skilled care service, [Filing No. 36-3 at 149-50].

The Court simply cannot make heads or tails of these designations, and Defendants have offered no explanation whatsoever as to the basis for their categorizations in the first place, or the inconsistencies among them in the second. Defendants have also offered no explanation as to how those distinctions might be "necessary for the provision of the service." As *Steimel* explained, Defendants "cannot avoid the integration mandate by binding [their] hands in [their] own red tape." *Steimel*, 823 F.3d at 916.

And finally, Defendants argue that Ms. Vaughn has not established that her requested accommodations are reasonable, because she "does not address how she can be provided home health care nursing in the midst of a nation-wide nursing shortage where no one, not Tendercare, not FSSA, not CICOA or IAHHC have been able to find available nurses to provide her with care. … Because no staff are available, her needs cannot be reasonably accommodated." [Filing No. 55 at 13.] The Court must point out, however, that all of the aforementioned attempts to locate providers were undercut by Defendants' insistence on their own policy requirement that certain aspects of Ms. Vaughn's care must be provided by skilled nurses. As described above, Defendants are not entitled to rely on those requirements. Moreover, the fact of a nursing shortage, assuming that one exists, more readily supports a conclusion that Ms. Vaughn's requested accommodations are reasonable. Ms. Vaughn's request that more of her services be provided by non-nursing staff

would help to *alleviate* the effects of a nursing shortage, which, as Defendants highlight, is an obstacle outside of their control.

For all of these reasons, the Court concludes that Ms. Vaughn has established that the accommodations she requests are reasonable.

## ii. Fundamental alteration

Defendants contend that, even if Ms. Vaughn's requested accommodations are reasonable, they constitute fundamental alterations of the state's existing programs. [Filing No. 37 at 11-14.] Focusing specifically on Ms. Vaughn's request to self-direct her care, Defendants rely on two arguments in support of their contention that such an accommodation would constitute a fundamental alteration: (1) that Indiana Medicaid has already determined that "many of Ms. Vaughn's required services are skilled services requiring a medical practitioner," and that prior authorization services do not allow for care by lay persons, [Filing No. 37 at 13; Filing No. 55 at 14-15]; and (2) that the self-directed care program is limited to "attendant care" services, and may not be used as a substitute for skilled care, which is provided via prior authorization services, [Filing No. 55 at 14].

Ms. Vaughn responds that Defendants have not met their burden to establish a fundamental alteration defense. [Filing No. 48 at 22.] Ms. Vaughn argues that Defendants have not contended that the allocation of resources to her accommodation would be inequitable, which is the typical grounds upon which to rest a fundamental alteration defense. [Filing No. 48 at 24.] She also argues that Defendants have not developed an *Olmstead* plan, which Department of Justice guidance interprets as being generally required as a prerequisite to raising a fundamental alteration defense. [Filing No. 8 at 24.] She also argues that, as to the self-directed care program, the Indiana legislature did not limit self-directed care options to attendant care services. [Filing No. 61 at 9.]

Instead, this limitation appears to be a policy decision made by FSSA; and again, she argues, FSSA may not merely point to its own policy as the only impediment to a reasonable accommodation. [Filing No. 61 at 10.]

"It is the state's burden to prove that the proposed changes would fundamentally alter their programs." *Steimel*, 823 F.3d at 916 (citing *Radaszewski ex rel. Radaszewski v. Maram*, 383 F.3d 599, 611 (7th Cir. 2004)). The "evaluation of whether a change would fundamentally alter the nature of a program should be holistic." *Steimel*, 823 F.3d at 915.

Defendants' fundamental alteration arguments are unavailing, in another parallel to *Steimel*, for one primary reason: they address the "alteration," but not the "fundamental." Defendants simply offer no evidence as to why any alteration could be considered fundamental. Indeed, Defendants have not even identified what factors might be considered in determining whether an alteration is fundamental, let alone whether the facts of this case establish that those factors are present. As in *Steimel*, Ms. Vaughn does not seek an increase in total services, beyond what she received prior to her hospitalization. *See Steimel*, 823 F.3d at 916-17. And Defendants clearly indicated at the hearing in this matter that resource allocation is *not* an issue in this case. Ms. Vaughn appears to request the same arrangement she had before—a combination of prior authorization and A&D Waiver services, but with modifications as to who provides those services, and to what programs they are "charged." The Court cannot discern from Defendants' briefing or hearing arguments what is "fundamental" about any of those proposed modifications.

The Court underscores that its decision here does not touch on the propriety of any state statute or regulation implementing the state's Medicaid programs. It makes no blanket assessment as to those programs as a whole. Defendants simply have not met their burden to establish that the accommodations Ms. Vaughn requests, based on the specifics of her case, constitute a

fundamental alteration.  As the *Steimel* court highlighted, "the question under the ADA is a simple one: what effect will changing the state's practices have on the provision of care to the … disabled, taking into account the resources available to the state and the need to avoid discrimination?" *Steimel*, 823 F.3d at 915.  Defendants have made no showing that any negative consequences will flow as to the provision of care to disabled persons.  Indeed, to the extent that there is any evidence on this point at all, it points the other way.  Ms. Deitchman's affidavit states that Tendercare cannot take *any* extended care prior authorization and Medicaid waiver case under the state's current policies, and based on Ms. Deitchman's experience, she believes that other health care agencies face the same challenges as Tendercare.  [Filing No. 47-4 at 4-5.]

*Steimel*'s words ring as true here as they did in that case: "the state cannot avoid the integration mandate by painting itself into a corner and lamenting the view."  *Steimel*, 823 F.3d at 918.  The bottom line here is that Defendants' own policies—which the Court finds are wholly unjustified on this record—currently prevent Ms. Vaughn from designing a plan of care that might allow her to receive care at home, and that has resulted here in the violation of the integration mandate under the ADA and the Rehabilitation Act.

### B. Medicaid Act Claim

Congress enacted the Medicaid Act in 1965 as an amendment to the Social Security Act of 1935.  *See* 42 U.S.C. §§ 1396 *et seq.*  Medicaid is a joint federal-state program that provides medical assistance to low-income individuals.  *Id.*  Under the program, "the Federal Government provides financial assistance to States so that they may furnish medical care to needy individuals."  *Planned Parenthood of Ind., Inc. v. Comm'r of Ind. State Dep't Health*, 699 F.3d 962, 969 (7th Cir. 2012).  States are not required to participate in the Medicaid program, but if

they do, they are required to comply with applicable federal statutes and regulations.  *See Planned Parenthood*, 609 F.3d at 969.

The Medicaid Act requires that medical assistance "shall be furnished with reasonable promptness to all eligible individuals."  42 U.S.C. § 1396a(a)(8); *see also O.B. v. Norwood*, 838 F.3d 837, 839 (7th Cir. 2016).  "Medical assistance" is defined as including, *inter alia*, home health care services, 42 U.S.C. § 1396d(a)(7); private duty nursing services, 42 U.S.C. § 1396d(a)(8); any medical or remedial services (provided in a facility, a home, or other setting) recommended by a physician or other licensed practitioner of the healing arts within the scope of their practice under State law, for the maximum reduction of physical or mental disability and restoration of an individual to the best possible functional level, 42 U.S.C. § 1396d(a)(13)(C); and personal care services furnished to an individual who is not an inpatient or resident of a hospital, nursing facility, intermediate care facility for the mentally retarded, or institution for mental disease that are (A) authorized for the individual by a physician in accordance with a plan of treatment or (at the option of the State) otherwise authorized for the individual in accordance with a service plan approved by the State, (B) provided by an individual who is qualified to provide such services and who is not a member of the individual's family, and (C) furnished in a home or other location, 42 U.S.C. § 1396d(a)(24).  Federal regulations require that this medical assistance be furnished "promptly to recipients without any delay caused by the agency's administrative procedures."  42 C.F.R. § 435.930(a).

Ms. Vaughn alleges that Defendants have violated the Medicaid Act by failing to provide her with community-based services with reasonable promptness. [Filing No. 1 at 14.]  Defendants move for summary judgment on this claim, arguing that any delay in the provision of services to Ms. Vaughn—in this case, her continued institutionalization—has been caused by factors outside

of their control, and not by their own administrative procedures. [Filing No. 37 at 19.] Ms. Vaughn also moves for summary judgment, arguing that Defendants' own policies are the cause of the delay.[6] [Filing No. 48 at 27-30.]

The parties appear to agree that Ms. Vaughn has experienced a delay in the provision of services. She was approved by her treating physicians for discharge home no later than February of 2016, and (with another intervening hospital stay) she remains institutionalized today. The sole disputed issue is whether the delay in her case is caused by Defendants. Both parties point to *O.B. v. Norwood* as instructive as to this issue, and the Court agrees.

*O.B.* involved a class of child-plaintiffs who were hospitalized with serious medical conditions. *O.B.*, 838 F.3d at 839. The lead plaintiff, O.B., was approved by the Illinois Department of Healthcare and Family Services ("HFS") to receive home-nursing care with a monthly budget of $19,718. *Id.* While HFS provided the approval and the funds, it left O.B.'s parents to find and arrange for that care. *Id.* at 839-40. As the court described the scenario, HFS "left it to the parents to find the nurses, which they couldn't do before they knew when their son would be ready to be released by the hospital—and it wasn't safe for him to leave the hospital until his parents hired the nurses needed to take care of him at home."[7] *Id.* at 840. It took O.B.'s parents almost a year to obtain adequate home-nursing staff. *Id.* His parents then filed suit on his behalf, and on behalf of others similarly situated, arguing that HFS failed to provide medical assistance

---

[6] The parties focus much of their briefing on the issue of whether Ms. Vaughn may properly challenge the adequacy of Medicaid reimbursement rates. The Court need not delve into that issue, because reimbursement rates, adequate or not, are not determinative as to Ms. Vaughn's claim.

[7] The Court notes that this is remarkably reminiscent of Dr. Trambaugh's difficulty in certifying Ms. Vaughn for release. He believed that Ms. Vaughn was ready and able to be discharged home, but he was never able to sign off on Ms. Vaughn's home healthcare certification because no provider had been located. [Filing No. 61-2 at 38.]

with the "reasonable promptness" required by the Medicaid Act. *Id.* at 839. The district court granted the plaintiff class's motion for a preliminary injunction. *Id.*

On appeal, the Seventh Circuit affirmed the district court's grant of the injunction. The court rejected HFS's contention that the provision of "medical assistance" under the Act required only that the state provide funding for the plaintiffs' care. *Id.* at 841-42. The court reasoned that while the Medicaid Act originally defined the term "medical assistance" as "payment of part or all of the costs of" enumerated care, 42 U.S.C. § 1396d(a) (2009), that definition changed following the passage of the Patient Protection and Affordable Care Act. *Id.* at 843. As the court explained, Congress amended that definition to clarify that "where the Medicaid Act refers to the provision of services, a participating State is required to provide (or ensure the provision of) services, not merely to pay for them." *Id.* The court concluded that, as far as the record indicated, HFS had done nothing to attempt to locate caregivers for plaintiffs, and that some measure more was required. *Id.* at 842.

Defendants argue that, unlike the defendants in *O.B.*, they have gone to great lengths to attempt to locate providers for Ms. Vaughn. [Filing No. 37 at 20-21.] They contend that they have called dozens of agencies in an attempt to locate one that would agree to provide Ms. Vaughn's care, and none have been found. [Filing No. 37 at 20-21.] They argue that factors entirely outside of their control, such as the nursing shortage or the refusal of home healthcare agencies to provide care, have resulted in the delay in providing Ms. Vaughn with the medical assistance she seeks. [Filing No. 37 at 21.] Therefore, they argue, this case is distinguishable from *O.B.*, and Defendants have done all that is required of them by the Act. [Filing No. 37 at 21-22.]

Ms. Vaughn does not dispute the measures that Defendants have taken in an attempt to locate care providers, although she does not concede that phone calls alone are necessarily

sufficient for Defendants to discharge their duty under the Act. [Filing No. 48 at 29.] But, she argues, Defendants' rigid adherence to their own inconsistent administrative procedures has resulted in the delay in services that currently leaves her institutionalized, and therefore Defendants violate the Medicaid Act. [Filing No. 61 at 15.]

The Court need not belabor its analysis here, because its reasoning as to this issue mirrors the issues and reasoning that applied in the ADA and Rehabilitation Act context. As the Court described at length above, Defendants' own administrative choices—namely, the restrictions they have imposed on Ms. Vaughn's home healthcare provision pursuant to their Medicaid Policy Manual—have resulted in their inability to find a caregiver, or combination of caregivers, who can provide Ms. Vaughn's care in a home-based setting. It may be the case that other factors, such as the nursing shortage or inadequate reimbursement rates, contribute to or exacerbate the difficulty in finding a provider. But, at a minimum, Ms. Vaughn has established that Defendants' administrative choices, in addition to their denials of her reasonable accommodation requests, have resulted in her remaining institutionalized.

The Court therefore concludes that Defendants have violated the "reasonable promptness" provision of the Medicaid Act.

### C. Remedy

Having concluded that Defendants are in violation of the ADA, the Rehabilitation Act, and the Medicaid Act, all that remains for resolution is the proper relief that should be granted. Ms. Vaughn seeks an injunction requiring that Defendants take immediate and affirmative steps to arrange for home-based care. As the court described in *Steimel*, this Court, "in conjunction with the parties, may exercise its equitable powers to craft an appropriate injunction." *Steimel*, 823 F.3d at 918.

As the parties highlighted at the hearing in this matter, a Medicaid plan of care for Ms. Vaughn would typically be developed as a collaborative effort between Defendants, Ms. Vaughn, and her medical care team. The Court concludes that this is also the best approach to moving forward on injunctive relief. Of course, when the relevant parties attempted to design a plan of care on prior occasions, they did so based upon the caregiver restrictions imposed by Defendants, and based upon Defendants' rejection of Ms. Vaughn's requested reasonable accommodations.

As the Court has described above, those restrictions cannot stand when they result in Ms. Vaughn's continued and indefinite institutionalization. So the parties must return to the drawing board. At the hearing, Defendants complained that Ms. Vaughn has not yet identified by name specific individuals or providers that might be willing and able to provide the care she seeks. But, again, Ms. Vaughn can hardly have been expected to do so, when she objected to the very limitations being imposed by Defendants on those providers.

Having determined the issue of liability against Defendants and in Ms. Vaughn's favor, the Court hereby **CONVERTS** the July 30, 2018 bench trial in this matter to a remedy hearing. The Court underscores that time is of the essence in this matter. It credits Ms. Vaughn's evidence that continued institutionalization is more than undesirable for her—it poses continuing and real threats to her health or her life, including, but not limited to, increased risk of nosocomial infection and decubitus ulcers. The goal for all parties should be to get Ms. Vaughn to a home-based setting as expediently as possible.

The Court therefore requests that the Magistrate Judge meet with the parties at her earliest availability, in the hopes that the parties can craft an appropriate remedy prior to the hearing date. Defendants have thus far devoted considerable time and effort to attempting to locate care providers for Ms. Vaughn, and the Court has every expectation that similar concerted efforts now,

consistent with the Court's conclusions here, will result in a positive resolution. In addition to her requested reasonable accommodations, Ms. Vaughn has identified other avenues, such as the "MFP" program discussed at the May 22 hearing, that might also achieve the desired result. The parties should entertain and discuss all feasible options.

If an agreement cannot be reached prior to the remedy hearing, the parties should submit briefing as to what injunctive relief would be appropriate. That briefing should include a plan, or several alternative proposed plans of care (the Court uses this term in a non-technical sense) for Ms. Vaughn. Those plans should provide as much specificity as possible, and should include: what daily care tasks Ms. Vaughn requires; the names of individuals or entities who have agreed or are likely to agree to provide the care identified therein; what specific tasks each provider would provide and pursuant to which Medicaid programs; and what reasonable accommodations, if any, are necessary and apply to each program. As the Court noted at the recent hearing, any plan should also include an updated evaluation of Ms. Vaughn by her treating physician.

A briefing schedule shall issue by separate, pre-hearing order.

## IV.
### CONCLUSION

For the reasons described above, the Court **DENIES** Defendants' Motion for Summary Judgment, [36], and **GRANTS** Ms. Vaughn's Cross-Motion for Summary Judgment, [47], to the extent that it concludes that Defendants have violated the ADA, the Rehabilitation Act, and the Medicaid Act, and that Ms. Vaughn is entitled to injunctive relief.

The Court **CONVERTS** the July 30, 2018 bench trial to a remedy hearing, and **VACATES** the final pretrial conference scheduled for July 5, 2018.

The precise contours of Ms. Vaughn's relief will be determined at the **July 30, 2018** remedy hearing.

Date: 6/1/2018

Hon. Jane Magnus-Stinson, Chief Judge
United States District Court
Southern District of Indiana


Distribution:

Benjamin Myron Lane Jones
INDIANA ATTORNEY GENERAL
benjamin.jones@atg.in.gov

Mark W. Sniderman
SNIDERMAN NGUYEN LLP
mark@snlawyers.com

Patricia H. Strachan
OFFICE OF THE ATTORNEY GENERAL
patricia.strachan@atg.in.gov