UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| KAREN D. VAUGHN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 1:16-cv-03257-JMS-DLP |
| | ) | |
| JOHN J. WERNERT, M.D. in his official capacity as Secretary of the Indiana Family and Social Services Administration, | ) | |
| YONDA SNYDER in her official capacity as Director of the Division of Aging of the Indiana Family and Social Services Administration, | ) | |
| JOSEPH MOSER in his official capacity as Director of the Office of the Medicaid Planning and Policy of the Indiana Family and Social Services Administration, | ) | |
| | ) | |
| Defendants. | ) | |

**ORDER**

An American Vice President once spoke about the treatment of certain members of American society as a reflection of its government: "the ultimate moral test of a government is the way it treats three groups of its citizens. First, those who are in the dawn of life—our children. Second, those in the shadows of life—our needy, our sick, our handicapped. Third, those in the twilight of life—our elderly." Vice President Hubert Humphrey, remarks at the dedication of the Hubert H. Humphrey Building, November 1, 1977, Congressional Record, November 4, 1977, vol. 123, p. 37287.

In its Order on summary judgment in this case, the Court concluded that Defendants have failed that moral test, and that their actions violated the Americans with Disabilities Act, the Rehabilitation Act, and the Medicaid Act. Karen Vaughn has been institutionalized for nearly three years, and she remains institutionalized. The Court sought briefing from the parties and

1

conducted a hearing as to the issuance of injunctive relief. Briefing was completed on January 8, 2019. Having considered the evidence adduced at the hearing and the briefs of the parties, the Court concludes that a permanent injunction is appropriate and **GRANTS** Ms. Vaughn's request for a permanent injunction.

## I.
### BACKGROUND[1]

Ms. Vaughn has lived with quadriplegia since 1976. [Filing No. 36-2 at 27.] Between 1981 and 2016, Ms. Vaughn lived in her own apartment, where she received Medicaid-funded services from home healthcare providers to assist in nearly all of her activities of daily living. [Filing No. 36-2 at 9.] After a several-week hospitalization from pneumonia in January 2016, Ms. Vaughn was medically approved for discharge home. [Filing No. 36-2 at 20.] Despite efforts by several individuals working within the parameters imposed by the state Medicaid plan and its waiver programs, no home healthcare agencies were located that were willing and able to provide Ms. Vaughn's home-based care. [*See, e.g.*, Filing No. 62-1 at 12-27; Filing No. 36-1.] As a result, Ms. Vaughn remained at Methodist Hospital, despite her medical providers' agreement that she would be better served by receiving care at home. [*See, e.g.,* Filing No. 36-2 at 20; Filing No. 62-1 at 25-26.] Over the following months, Ms. Vaughn's treating physicians at Methodist continued to support her return home, and a licensed clinical social worker and a nurse case manager attempted to locate an agency or agencies that would provide Ms. Vaughn's care under the regime established by Defendants. [Filing No. 62-1 at 9-27.]

---

[1] The Court provided a detailed recitation of the facts of this case in its Order on summary judgment. [Filing No. 68.] As such, the Court briefly summarizes the background here and specifically details only the relevant facts that have developed following that Order.

After several months of failed attempts to locate a provider, on April 12, 2016, Ms. Vaughn sent a letter to Indiana's Family and Social Services Administration ("FSSA") stating that she was being institutionalized at Methodist against her will. [Filing No. 36-2 at 114.] In that letter, she requested that FSSA provide her with one or more reasonable accommodations pursuant to the Americans with Disabilities Act that would, in her view, enable her to receive care at home. [Filing No. 36-2 at 114.] Ms. Vaughn received no response to that letter. [Filing No. 36-2 at 45; Filing No. 118 at 89.] On July 26, 2016, FSSA Division of Aging staff met with Ms. Vaughn, hospital staff and doctors, Ms. Vaughn's advocates, and her legal counsel to discuss a care plan that included finding a home healthcare provider for Ms. Vaughn. [Filing No. 36-1 at 2.] But again, within the bounds of the current Medicaid programs, as administered by FSSA, no healthcare providers were found. [Filing No. 36-2 at 60.]

Still having found no home healthcare provider, in mid-November 2016, Ms. Vaughn was discharged to North Capitol nursing home. [Filing No. 36-2 at 60.] She filed a Complaint in this Court on November 30, 2016 alleging violations of the Americans with Disabilities Act, the Rehabilitation Act, and the Medicaid Act arising from Defendants' alleged failure to provide her with reasonable accommodations that would allow her to return home. [Filing No. 1.] Ms. Vaughn resided at North Capitol through February 2017, when she was hospitalized at Methodist after developing a decubitus ulcer that required surgery. [Filing No. 36-2 at 23-24.] After that surgery, Ms. Vaughn was again medically cleared for discharge home, but again, no home healthcare providers were found. [Filing No. 36-2 at 25; Filing No. 36-1 at 3-4.] In December 2017, Ms. Vaughn was discharged to Ambassador Healthcare nursing home in Centerville, Indiana, where she still resides today. [Filing No. 36-2 at 23; Filing No. 47-1 at 1; Filing No. 118 at 84-85.]

3

In early 2018, the parties filed cross-motions for summary judgment on Ms. Vaughn's claims. [Filing No. 36; Filing No. 47.] The Court granted Ms. Vaughn's Motion for Summary Judgment, concluding that Defendants failed to provide a reasonable accommodation that would allow for Ms. Vaughn's placement at home, in violation of the ADA and the Rehabilitation Act. [Filing No. 68 at 27.] The Court also concluded that Defendants violated the Medicaid Act's requirement that medical assistance be provided with reasonable promptness to all eligible individuals. [Filing No. 68 at 31.]

Having made this finding as to liability, the Court converted the trial in this matter to a remedy hearing, and it encouraged the parties to reach an agreement as to the injunctive relief that should be implemented. [Filing No. 68 at 32-33.] The parties were unable to do so, and the Court held a remedy hearing on December 3, 2018. [Filing No. 114.] The parties presented evidence and legal argument, and they have submitted their post-hearing briefing, as ordered by the Court. The issue of remedy is now ripe for the Court's determination.

## II.
### FINDINGS

### A. Propriety of Injunctive Relief

In determining whether injunctive relief is appropriate, a Court generally considers "(1) whether the plaintiff has suffered or will suffer irreparable injury, (2) whether there are inadequate remedies available at law to compensate for the injury, (3) the balance of hardships, and (4) the public interest." *Sierra Club v. Franklin Cty. Power of Illinois, LLC*, 546 F.3d 918, 935 (7th Cir. 2008). Ms. Vaughn seeks only injunctive relief through this lawsuit, and the parties in their cross-motions for summary judgment addressed the issue of the propriety of injunctive relief alongside (and largely overlapping with) their arguments regarding liability. [Filing No. 55 at 22; Filing No. 61 at 14-15.] As such, the Court's discussion of liability, and its decision on the merits at summary

judgment "essentially embraced the remedy and the injunctive relief factors" that a Court routinely considers. *Sierra Club*, 546 F.3d at 937. The parties, therefore, have focused their attention (in both their briefing and at the remedy hearing) on the substance of the anticipated injunction.

In response to Ms. Vaughn's post-hearing briefing, however, Defendants argue that Ms. Vaughn has failed to "meet her burden of proof" as to the propriety of injunctive relief by failing to present argument as to the four injunctive relief factors. [Filing No. 120 at 7.] Defendants argue, therefore, that the Court "must deny her request for injunctive relief." [Filing No. 120 at 7.] The Court disagrees, and in the interest of clarity and completeness, the Court details its findings regarding the propriety of injunctive relief.

*1. Irreparable Injury*

The Court concludes, based on the undisputed evidence, that Ms. Vaughn has suffered and would continue to suffer irreparable injury as the result of continued institutionalization. Ms. Vaughn has presented undisputed medical testimony as to the dangers that institutionalization poses to her health, and she has already suffered demonstrable physical harm. In addition to the increased risk of nosocomial infections she faces, she is also prone to developing decubitus ulcers (bedsores) while institutionalized. As highlighted in the Court's summary judgment Order, while Ms. Vaughn had not developed a bedsore in the twenty years preceding her January 2016 hospitalization, since her institutionalization, she has undergone several surgeries as the result of recurrent decubitus ulcers. Moreover, Ms. Vaughn has experienced the adverse mental and emotional consequences associated with the institutional segregation and isolation that the ADA prohibits. *See Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581 (1999). This factor weighs heavily in favor of injunctive relief.

*2. Adequate Remedies at Law*

Defendants contend that Ms. Vaughn has not argued that she lacks an adequate remedy at law. But Ms. Vaughn has made clear throughout the course of this lawsuit that the only relief she seeks is to receive care at home. Defendants have not identified, and the Court is unaware of, any remedy at law that could accomplish that result. There is no remedy at law to compensate Ms. Vaughn for her injuries, and this element weighs heavily in favor of injunctive relief.

*3. Balance of Hardships*

Defendants are tasked with administering Medicaid and other healthcare-related programs. They have repeatedly represented to the Court that they share the same goal with Ms. Vaughn: for her to safely receive care at home. [*See, e.g.,* Filing No. 95 at 1 ("This Court, Karen Vaughn, and the defendants all want the same thing: that Ms. Vaughn be able to receive care safely in her own home.").] Defendants have not identified any hardship that they would suffer if injunctive relief were granted, and they have not argued that an order granting injunctive relief would impede their ability to carry out the tasks of their offices. Defendants have also assured the Court that there are no issues concerning the availability of funds to provide for Ms. Vaughn's care. On the other hand, the hardships suffered by Ms. Vaughn if she remains institutionalized are severe, and they have been thoroughly discussed by the Court here and in its Order on summary judgment. The Court therefore concludes that this factor weighs heavily in favor of injunctive relief.

*4. Public Interest*

In enacting the ADA, Congress noted that "historically, society has tended to isolate and segregate individuals with disabilities, and, despite some improvements, such forms of discrimination against individuals with disabilities continue to be a serious and pervasive social problem." 42 U.S.C. § 12101(a)(2). That statute was intended to "provide a clear and

comprehensive national mandate for the elimination of discrimination against individuals with disabilities." 42 U.S.C. § 12101(b)(1); *see also* 29 U.S.C. § 701(a)(3) (Congressional finding as to Rehabilitation Act that "disability is a natural part of the human experience and in no way diminishes the right of individuals to…live independently [and]...enjoy full inclusion and integration in the economic, political, social, cultural, and educational mainstream of American society.").

The public has a strong interest in eliminating discrimination and in enforcing the ADA, the Rehabilitation Act, and the Medicaid Act. And the public has a strong interest in the appropriate and efficient administration of healthcare services and programs by the state agencies that Defendants oversee. As the Court noted above, Defendants have represented that the availability of funds is not an issue, and they have identified no public interest that would be harmed by the issuance of an injunction here. Notably in this context, Defendants have not contended that the provision of home healthcare to Ms. Vaughn would result in any adverse impact to other Medicaid recipients. *Cf. O.B. v. Norwood*, 838 F.3d 837, 842 (7th Cir. 2016) ("This is not to suggest that the district court could order nurses to be removed from positions caring for other people and transferred to the homes of the members of the plaintiff class."). This factor, therefore, weighs in favor of an injunction.

Having concluded that the above factors weigh unequivocally in favor of injunctive relief, the Court concludes that a permanent injunction is both appropriate and necessary here.

**B**. **Content of the Injunction**

Federal Rule of Civil Procedure 65 governs the content and scope of permanent injunctions. That rule provides that every order granting an injunction must: "(A) state the reasons why it issued; (B) state its terms specifically; and (C) describe in reasonable detail—and not by

7

referring to the complaint or other document—the act or acts restrained or required." Fed. R. Civ. P. 65(d). The Seventh Circuit has observed that, while an injunction must state its terms specifically, it must also "be broad enough to be effective, and the appropriate scope of the injunction is left to the district court's sound discretion." *Russian Media Group, LLC v. Cable Am., Inc.*, 598 F.3d 302, 307 (7th Cir. 2010).

Through a remedy hearing as well as pre- and post-hearing briefing, the Court sought the parties' participation in crafting the instant injunction. Ms. Vaughn has proposed a variety of possible terms. [*See* Filing No. 93; Filing No. 117.] Defendants take issue with all of those terms and have not proposed any in the alternative. [*See* Filing No. 95; Filing No. 120.] Defendants' arguments regarding the injunction's content largely overlap with the arguments they raised on the merits of Ms. Vaughn's claims, and they can be generally classified into three categories: (1) that Defendants have already undertaken every possible effort to achieve the relief sought by the injunction: getting Ms. Vaughn home; (2) that Ms. Vaughn's proposed terms are too vague to be enforceable; and (3) that the Court lacks the authority to award the relief Ms. Vaughn seeks. [*See, e.g.,* Filing No. 120.]

The Court has already made its determination on the merits that Defendants' actions here violate the ADA, the Rehabilitation Act, and the Medicaid Act, and to the extent that Defendants' arguments retread that territory, the Court need not follow suit. In enlisting the parties' participation in crafting the equitable relief, the Court asked the parties to educate it about the available programs and resources at Defendants' disposal—information that was largely within the control of Defendants and their employees.

What the evidence revealed, however, is a bureaucratic quagmire—both substantive and procedural—that FSSA officials struggled to explain to this Court. The evidence made clear that,

procedurally, FSSA officials have made paltry efforts to coordinate internally regarding the provision of home-based care to Ms. Vaughn, and that they have delegated vast responsibility to contracting agencies to navigate the complex system Defendants have created. The Court could draft a lengthy order detailing the ways in which Defendants have failed to collaborate, communicate, and engage in a meaningful effort to secure home-based care for Ms. Vaughn. In the interest of expediency, it will simply highlight several of the issues that featured prominently in the remedy hearing.

Take, for example, the interaction between two programs implicated in Ms. Vaughn's case: traditional Medicaid programs (referred to by witnesses as the "state plan"), administered by the Medicaid Division, and waiver programs, which are administered by the Division of Aging. FSSA views waiver programs as "supplement[s]" to the care options available under the state plan. [Filing No. 118 at 146.] At the remedy hearing, the Court asked the Care Management Director for the Division of Aging whether the Medicaid Division first determines what care is available under the state plan, and whether the Division of Aging then determines what programs are available to fill in any gaps in coverage. [Filing No. 118 at 146.] She responded that the Division of Aging cannot see what the state plan has provided, because it is "fragmented in [their] system." [Filing No. 118 at 146 ("Q: Why can't you see the state plan if you are supposed to be supplementing it? A: Part of it is just our system[], the way it is structured. It is just fragmented in our system.").]

Instead, care managers (who are employed by agencies that contract with FSSA) rely on information they receive from private home healthcare agencies—not their own sister-divisions— regarding an individual's plan of care and "put[] that in the documentation on the service plan." [Filing No. 118 at 146.] Apparently, each division then consults that document to know what the

9

other divisions are doing. And in this case, when Ms. Vaughn's contracted care managers performed the specific task delegated to them—calling home healthcare agencies—the fact that those care managers received no affirmative responses apparently did not alert Defendants that further action by them was necessary to secure the integrated care to which Ms. Vaughn is entitled. Defendants were content to stop trying. In choosing this course of action, Defendants appear motivated by two concerns: administrative minimization through contractual delegation, and cost-savings. Notably absent from that list is the concern Defendants have professed during the latter stages of this litigation—a "shared" desire to get Ms. Vaughn out of the institution in which she is being held. The irony of Defendants' recalcitrance is highlighted by FSSA's purported mission, to "develop, finance and compassionately administer programs to provide healthcare and other social services to Hoosiers in need in order to enable them to achieve healthy, self-sufficient and productive lives." FSSA website, last accessed January 9, 2018, https://www.in.gov/fssa/4839.htm.

Nowhere are these concerns for administrative minimization and cost-savings (as well as a lack of substantive understanding of relevant programs) more apparent than in the testimony of Erin Wright, the Division of Aging's Director of Access and Engagement. The Court begins with Ms. Wright's testimony regarding the Community and Home Options to Institutional Care for the Elderly and Disabled ("CHOICE") program. CHOICE is a state-funded program established by statute and administered by the Division of Aging. Ind. Code § 12-10-10. Among other services, it provides for home healthcare, including skilled nursing, attendant care, and self-directed care options. Ind. Code § 12-10-10-2, 6(9). According to FSSA's website, the program is designed to assist individuals in "maintaining their independence" and avoiding institutionalization. *See* FSSA website, last accessed January 9, 2019, https://www.in.gov/fssa/da/5492.htm. Individuals are

instructed by FSSA to apply for the CHOICE program via their local Agency on Aging. *Id.* It appears that Ms. Vaughn would be eligible for this program, if anyone had considered her as having applied for it.[2] [*See, e.g.,* Filing No. 118 at 100 (Ms. Wright testifying that "CHOICE is the funding of last resort, and it is only to be utilized when all other options have been looked at.").]

Ms. Wright initially testified that Medicaid programs and CHOICE do not interact with one another, and, pointing generally to the Indiana administrative code, that being a recipient under a Medicaid waiver program disqualifies an individual from services under CHOICE. [Filing No. 118 at 99-100; Filing No. 118 at 107-110.] This testimony is factually incorrect. The Court drew Ms. Wright's attention to 455 IAC 1-5-3(a), which states that the Division of Aging "shall contract with the Area Agencies on Aging to administer CHOICE funds. These activities include…policies and procedures for coordinating CHOICE with the Medicaid waivers and other funding sources for in-home and community-based services." [Filing No. 118 at 110 (citing 45 I.A.C. 1-5-3(a)); *see also* Ind. Code § 12-10-10-6(8) (requiring that Division of Aging assist "in applying for Medicaid waivers from the United States Department of Health and Human Services to fund community and home care services needed by eligible individuals under this chapter").] The following exchange then ensued:

> The Court: Can you tell me where I can find what those policies and procedures are for the coordination of CHOICE funds with the Medicaid waiver program?
>
> Ms. Wright: Not specifically.

---

[2] Defendants appear to fault Ms. Vaughn for making no "allegation that she has ever requested or been denied access to CHOICE," [Filing No. 120 at 17], but the Court points out that Defendants' own materials direct individuals to their local Agency on Aging for information on the program and to apply. Ms. Vaughn has long been a client of her local agency, CICOA, which has repeatedly collaborated on her plans of care and programming requests, and made the phone calls on which Defendants rely as having discharged their obligations under the relevant statutes.

> The Court: All right. Because it seems to me a little bit inconsistent with what you just said, which is that you can't be on Medicaid and get CHOICE. So this would seem to contemplate that there is a coordination involved. So are you familiar with any efforts to engage in that coordination with the AAAs?
>
> Ms. Wright: I am not sure of the specific policies at the Area Agencies on Aging.
>
> The Court: And even though your division is charged with working with them. Okay.

[Filing No. 118 at 110.] Although Defendants' counsel attempted to rehabilitate Ms. Wright as a witness knowledgeable as to the programs and procedures within her Division, it was evident that her testimony agreeing with propositions propounded by her counsel was motivated simply by a desire to agree with him. As such, the rehabilitation efforts were unsuccessful.

Moreover, the testimony regarding the CHOICE program exemplifies the motivations that appear to underlie Defendants' actions here, and their lack of concern with conducting any investigation or efforts to remove Ms. Vaughn from her institutionalization. First, Defendants characterize the CHOICE program as one of "last resort," only to be used when all other options have failed. The Court must ask: does Ms. Vaughn's situation not represent the failure of all other options, where "last-resort," flexible programs provide a path to solution? While Defendants point out that CHOICE is "not a slush fund," as described above, the CHOICE program *expressly* contemplates use in combination with waiver programs, and Defendants apparently never raised this as an option for Ms. Vaughn.

Second, Ms. Wright testified that CHOICE reverted large sums of unspent money back to the state of Indiana in 2017 and 2018, despite the program carrying a waiting list of nearly 2,000 people.[3] [Filing No. 118 at 101.] When asked why such a long waiting list exists when funds are being reverted, she responded that the waiting lists are "regional," and that some regions (such as

---

[3] The Director did not testify as to the amount of the reversion, but the Court gathers that it may exceed $1 million. [*See* Filing No. 118 at 35 (testimony of Nancy Griffin).]

the one Ms. Vaughn is in, which currently carries a waitlist of 481 people) demonstrate higher demand for CHOICE funds than others. [Filing No. 118 at 112.] Ms. Wright testified that the Division of Aging has the ability to reallocate funds to higher-demand areas, as opposed to reverting them, and that the Division of Aging "just hasn't done it yet." [Filing No. 118 at 112-113 ("Q: And why doesn't the agency reallocate it so the waiting lists are eradicated? A: The state has been—or the Division of Aging has been looking at reallocation options. It just hasn't been. Q: Just hasn't done it yet? A: Yeah.").]

At a minimum, and certainly during the pendency of this lawsuit, the Court expected that the officials of different divisions within FSSA would have met to discuss how their various programs (which are often used in combination with one another to provide for the entirety of an individual's care) could coordinate to solve the problem of providing Ms. Vaughn with care in a non-institutional setting. That never happened in Ms. Vaughn's case, and apparently, has never happened between the Director of Quality and Outcomes for Indiana Medicaid and the Care Management Director for the Division of Aging. [Filing No. 118 at 141 ("Q: Have you ever done that with the Division of Aging…sat down to say how can we solve this problem and get this person home? A: No.").]

The parties discuss the ways in which a number of obstacles impact Defendants' ability to secure care for Ms. Vaughn, including low Medicaid reimbursement rates for extended-hours home healthcare services and limitations on nurse delegation imposed by Indiana Department of Health requirements. In light of those obstacles, Defendants describe their efforts to remove Ms. Vaughn from the institutional settings into which she has been placed as "exhaustive," and as discharging the statutory duties imposed upon them. [Filing No. 95 at 2.] They contend that there simply is nothing else they can or should be ordered to do. But those so-called exhaustive efforts

have amounted to one activity: Defendants called a list of home healthcare providers to inquire as to whether they would be willing to provide Ms. Vaughn's care under the funding regime established by Defendants.[4] The evidence here has demonstrated that if the Court were to accept Defendants' position, Ms. Vaughn (and no doubt other similarly situated, ventilator-dependent individuals in Indiana) would be indefinitely relegated to institutions. In this Court's view, that is an outcome that the ADA prohibits.

The "state designs, applies for, develops policies regarding, and executes its waiver programs," *Steimel v. Wernert*, 823 F.3d 902, 918 (7th Cir. 2016), and it does not do so in a vacuum. It does so within the real world of state regulatory requirements and economic realities. To accept Defendants' argument would be to conclude that the state could set its reimbursement rates so low that, given the regulatory framework and economic system within which home healthcare agencies operate, no agency could afford to take certain categories of Medicaid recipients, and those individuals would all be forced into nursing homes. The state has designed and maintained its Medicaid programs with the knowledge that there are only a small number of home healthcare agencies in Indiana that provide services for patients who are dependent on ventilators, as Ms. Vaughn is. [*See, e.g.,* Filing No. 118 at 37-39.] And it has set its reimbursement rates with the knowledge of how those rates impact those few providers who provide ventilator and extended-hours nursing care. [*See* Filing No. 118 at 37-62 (testimony of Leslie Deitchmann); Remedy Hearing Exhibit 1 (Tendercare 2017 Cost Based Medicaid Rate Analysis).] Defendants' position would provide states with *carte blanche* to design and implement waiver programs that eviscerate the integration mandate for individuals with certain types of disabilities. Whether the

---

[4] Most of those phone calls, the Court must add, were not made by Defendants or FSSA employees, but rather by the above-mentioned contracted case workers.

Defendants' position is characterized as the state "binding its hands in its own red tape" or "painting itself into a corner and then lamenting the view," it cannot avoid the results of its own design and implementation decisions. *Steimel*, 823 F.3d at 917-18.

Ms. Vaughn has advocated for an injunction that orders Defendants to "[t]ake immediate and affirmative steps to successfully arrange[,] directly or through referral to appropriate agencies, organizations, or individuals, corrective treatment of home healthcare services." [Filing No. 117 at 17.] Defendants raise two interrelated arguments regarding this language: (1) that it exceeds the grounds upon which this Court decided the matter on summary judgment; and (2) that it is too vague to be enforceable. [Filing No. 120 at 6; Filing No. 120 at 9-13.]

Defendants argue that this Court's Order on summary judgment held that Ms. Vaughn succeeded only on a narrow subset of her claims—that is, that Court found violations of the ADA, the Rehabilitation Act, and the Medicaid Act only "to the extent that [Defendants'] policies required that some of [Ms. Vaughn's] care be provided by nurses." [Filing No. 120 at 6.] Therefore, Defendants contend, Ms. Vaughn's relief is limited only to an injunction that addresses that particular issue. [Filing No. 120 at 6.]

As to Defendants' first argument, the Court made no such limited holding, and there is no question here as to Ms. Vaughn's "degree" of success. The Court concluded that Defendants' practices and policies resulted in violations of the ADA, the Rehabilitation Act, and the Medicaid Act. [Filing No. 68 at 27.] In other words, Defendants have discriminated against Ms. Vaughn, as a ventilator-dependent individual who desires to live and is capable of living in a home-based, integrated setting. The Court discussed most extensively Defendants' refusal to modify their internal policy regarding skilled versus non-skilled tasks, but, as is often the case, a combination

15

of actions and omissions have resulted in the discrimination that Ms. Vaughn has suffered. She is entitled to relief that remedies that discrimination.

As to Defendants' contention that the language proposed by Ms. Vaughn is impermissibly vague, they have not offered any alternative formulation. As described above, the evidence Defendants presented as to the content and administration of their programs provides little assistance in developing a more specific indication of what they must do to achieve the end of successfully arranging home healthcare services for Ms. Vaughn. As the concurring opinion in *O.B. v. Norwood* stated, "[t]he principal problem with drafting such an injunction is one my colleagues mention: we do not know what will work. We shouldn't expect class counsel to have this knowledge; lawyers are not professional healthcare administrators. Nor should we expect the judge to know what the Department ought to do. The Department itself may not know what will suffice; it is so committed to the idea that all it need do is offer to pay for services that it may never have tried any other approach." *O.B.*, 838 F.3d at 844. Here, Defendants are so committed to the idea that all they must do is make phone calls (or delegate them) that they, likewise, have tried nothing else. For the reasons this Court has already described, in this instance, those phone calls are not enough.

The clearest roadmap, therefore, to achieving the end goal is the proposed plan of care submitted by Ms. Vaughn, which is similar to the plan of care approved and implemented for her prior to her January 2016 hospitalization. The Court hereby **ORDERS** Defendants to arrange for Ms. Vaughn, within 21 days, provision of the home health and attendant care services represented on this summary (which have already been approved by her AAA case manager):[5]

---

[5] It is the Court's view that the most expedient means of doing so would be to utilize the CHOICE and/or long-term care programs as supplements to Medicaid and waiver program offerings. Again, the Court is dismayed by Defendants' many arguments as to why the CHOICE program is

## DAILY SCHEDULE FOR KAREN VAUGHN

**7:30 AM:** Remove Vent, reading treatment (nebulizer), suctioning, trach care, empty urostomy bag, assist with medication, ROM (range of motion), bowel care, prepare and assist with morning meal

**9:00 AM:** Bath, skincare (change Mepilex dressing-gauze used as padding) if needed, get dressed, wash hair, makeup as desired, transfer to wheelchair

**10:30 AM:** In chair, relieve pressure every ½ hour (putting chair and reclined position) lunch for staff

**12 PM:** Light housekeeping, laundry, assist in personal business, removal of trash, dishes, run errands

**1:00 PM** prepare and assist with my lunch

**2:30 PM:** Get mail and assist opening, assist with phone calls, suctioning if needed (rare)

**3:00 PM** Provide transportation to include driving, operating lift, fix and release tie-downs, load/unload merchandise

**5:00 PM:** Assist with medications

**6:00 PM:** Repair and assist with dinner

**8:00 PM-9 PM:** Assistant with medications, empty urostomy bag, oral & facial care

**10:00 PM:** Transfer to bed wheelchair, skincare (change Mepilex dressing if needed, bowel regimen, nebulizer treatments, suctioning, trach care, change cannula before connecting to the ventilator

**12:00 AM-7:30 AM:** suction if needed (rare) and turn or reposition as needed (preferably 2 hours)

---

inapplicable here, if they indeed share Ms. Vaughn's goal to return her home. Ms. Vaughn raises a claim under the ADA, which applies to all of the state's healthcare programs. This Court sees no reason why the use of CHOICE could not comprise part of a reasonable accommodation.

17

Of course, medical necessity will dictate the specifics of Ms. Vaughn's care. The Court intends this as a sufficiently specific indication to Defendants as to what elements of care are required to successfully remove Ms. Vaughn from the institutional setting. All medical decision-making is left to the appropriate medical professionals, and nothing precludes Defendants from instead allowing Ms. Vaughn to craft a mutually acceptable plan of self-directed care. The Court has throughout the course of this litigation entertained Defendants' assessments of the obstacles to getting Ms. Vaughn home. But their assessments fail to comply with the integration mandate and other provisions of the relevant federal statutes. As the remedy hearing record reflects, there is at least one home healthcare agency with the capacity and desire to take on Ms. Vaughn's care. At this point, any obstacles to making that happen are within Defendants' control and of their making, and they shall do whatever is necessary to achieve the result mandated here. They have made clear that money is not the issue, and the Court takes that representation seriously.

Finally, the Court's injunction follows the well-settled rule permitting prospective injunctive relief against state actors. *See Edelman v. Jordan*, 415 U.S. 651, 668-69 (1974). No retroactive damages are involved, and as in *Edelman*, any funds Defendants must expend would be the necessary result of compliance with the Acts at issue. *Id.*

### III.
#### CONCLUSION

Having had its judgment in favor the state defendants reversed in *Steimel*, this Court is particularly mindful of that case's holding that the State of Indiana must ensure that its Medicaid programs comply with the integration mandate. *Steimel* 823 F.3d at 918. And the Court took seriously *Steimel*'s directive that in the event the plaintiff prevails, as Ms. Vaughn has, "the district court, in conjunction with the parties, may exercise its equitable powers to craft an appropriate injunction." *Id.* Through the tireless efforts of the magistrate judge, the Court attempted to engage

the parties to craft a solution, and to allow Defendants to look within or amend their own programs to bring their treatment of Ms. Vaughn into compliance with the Americans with Disabilities Act, the Rehabilitation Act, and the Medicaid Act. The only response has been bureaucratic intransigence, while a vulnerable citizen of our state has deteriorated as she remains institutionalized.

If the Defendants will not act to protect Ms. Vaughn and her rights, the Court will.

Final judgment shall issue accordingly.

Date: 1/9/2019

*Jane Magnus-Stinson*
Hon. Jane Magnus-Stinson, Chief Judge
United States District Court
Southern District of Indiana

**Distribution via ECF only to all counsel of record.**